NPG/GG 2011R0072

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : Hon. |
| v. | : Criminal No. 15-248 (JLL) |
| ITAMAR COHEN | : 18 U.S.C. § 371 |

## INFORMATION

The defendant having waived in open court prosecution by Indictment, and the defendant having waived any defenses in open court based upon any statutes of limitations, the United States Attorney for the District of New Jersey charges:

## RELEVANT ENTITIES AND INDIVIDUALS

1. At all times relevant to this Information:

    a. Defendant ITAMAR COHEN was a resident of Toronto, Ontario, Canada, and a partner in a stock promotion business in Canada that focused on "penny" or "micro-cap" stocks – the stocks of publicly traded companies with low share prices that often traded on quotation services and marketplaces operated by OTC Markets Group Inc., such as the OTC Bulletin Board ("OTCBB"), OTC QB, OTC Pink, or Pink Sheets.

    b. Co-conspirator # 1 ("CC#1"), who is named as a co-conspirator but not as a defendant herein, was a resident of Toronto, Ontario, Canada. CC#1 had worked as a stockbroker in Canada in the 1990s, and from approximately 2005 through approximately 2009, CC#1 operated the stock promotion business in Canada of which COHEN was a partner.

      c.     Co-conspirator #2 ("CC#2"), who is named as a co-conspirator but not as a defendant herein, was the founder and owner of a registered broker-dealer located in New York. CC#2 was also a penny stock promoter.

      d.     Co-conspirator # 3 ("CC#3"), who is named as a co-conspirator but not as a defendant herein, was a resident of Holmdel, New Jersey, and a penny stock promoter.

      e.     Raven Gold Corporation ("RVNG") was a Nevada corporation, whose headquarters were in Vancouver and Penticton, British Columbia, and its common stock was a penny stock quoted on the OTCBB. Although traded on the OTCBB, RVNG was controlled by two Canadian citizens (collectively the "RVNG Owners").

      f.     Kentucky USA Energy, Inc. ("KYUS") was a Delaware corporation headquartered in London, Kentucky, which purported to be engaged in shale gas exploration in western Kentucky. KYUS common stock was a penny stock quoted on the OTCBB. RVNG and KYUS are collectively referred to herein as the "Target Companies."

## **OVERVIEW OF THE STOCK MANIPULATION SCHEME**

2. From at least as early as April 2007 through in or about June 2008, COHEN and his co-conspirators engaged in an extensive "pump-and-dump" stock manipulation scheme involving the Target Companies, *i.e.*, a scheme to fraudulently inflate the prices of shares of the Target Companies in order to later sell those shares at artificially inflated prices. As part of the scheme, COHEN and his co-conspirators first obtained control over large blocks of the free trading shares of the Target Companies. Next, COHEN and his co-conspirators "pumped" the price of those shares by, among other things: (a) engaging in manipulative trading of the stocks of the Target Companies; and (b) disseminating misleading promotional materials touting the stocks and encouraging others to purchase them. After pumping the stocks, COHEN and/or his co-conspirators "dumped" them; that is, they sold large volumes of the Target Companies' stock to victim-investors. Following the dump phase, the Target Companies' stock prices dropped, causing victim-investors to suffer losses. The stock manipulation scheme generated approximately $17.2 million in illegal proceeds, of which COHEN and CC#1 received $2.4 million.

## THE CONSPIRACY

3. From at least as early as in or about April 2007 through in or about June 2008, in the District of New Jersey and elsewhere, defendant

## ITAMAR COHEN

knowingly and willfully conspired and agreed with others to commit an offense against the United States, to wit: securities fraud, contrary to Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## OBJECTS OF THE CONSPIRACY

4. It was a part and object of the conspiracy that COHEN and others willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, contrary to Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## MEANS AND METHODS OF THE CONSPIRACY

5. Among the means and methods by which the conspirators, including COHEN, would and did carry out the conspiracy were the following:

**The RVNG Pump and Dump Scheme**

a. In or about April 2007, the RVNG Owners solicited CC#1 and COHEN to promote the stock of RVNG as part of a pump and dump scheme. CC#1 and COHEN agreed to do so, and recruited CC#2 to execute the scheme. Between in or about May 2007 and in or about July 2007, the RVNG Owners caused large blocks of unrestricted RVNG shares to be delivered to brokerage accounts controlled by COHEN, CC#1 and CC#2. Ultimately, COHEN, CC#1 and CC#2 each received approximately 10 million unrestricted RVNG shares, which constituted approximately 30% of RVNG's total unrestricted stock.

*Manipulative Trading*

b. Upon receiving the RVNG shares, COHEN, CC#1 and CC#2 agreed that they would engage in a pattern of manipulative trading designed to create the appearance of liquidity and market depth for RVNG. For example, CC#2 engaged in trades of RVNG stock in which he or others acting in concert with him were on both the "buy" and "sell" side of the same trades. These trades were purely designed to create the appearance of market interest in RVNG. In fact, throughout June 2007, CC#2's trading in various brokerage accounts that he controlled accounted for a substantial portion of RVNG's daily trading volume.

5

   c. In other cases, CC#2 created the appearance of market interest in RVNG by transferring blocks of unrestricted RVNG stock to individuals acting in concert with the co-conspirators to induce them to purchase additional RVNG shares during the promotion, and thereby further the artificial appearance of interest in RVNG. For example, between on or about June 28, 2007 and on or about July 2, 2007, CC#2 caused approximately 10,000 RVNG shares to be transferred to CC#3 in New Jersey. As a result, CC#3 purchased an additional 10,000 RVNG shares on or about June 29, 2007.

### The RVNG Promotional Mailer

   d. The centerpiece of the RVNG pump and dump scheme was an eight-page, glossy promotional mailer (the "RVNG Mailer") and various other media advertisements that COHEN and his co-conspirators caused to be widely disseminated in or around July 2007.

   e. The RVNG Mailer was materially false in numerous ways. For example, it was misleadingly titled, "Stock Trend Report," and claimed to be a July 2007 "Special Edition For Premium Members." In reality, Stock Trend Report was a fictional name that was created specifically for the scheme. It also claimed that RVNG had been "seen on" CNBC and Bloomberg, as well as in the Wall Street Journal, New York Times, and other publications. This statement was materially misleading because it created the false impression that RVNG was a subject of reporting in those publications, and failed to disclose that in reality the stock was only "seen" in paid advertisements placed

by the co-conspirators. In addition, the RVNG Mailer touted RVNG's "strong move upward" in "recent weeks," which the mailer attributed to the company's strong business prospects, and contained a chart covering the time period from early May to mid-June 2007 and purportedly showed the stock's "remarkable uptrend so far." These statements were materially misleading because the RVNG Mailer failed to disclose that a substantial portion of the market activity reflected in the chart was the manipulative trading by CC#1, CC#2 and others which was executed, at least in part, to create the chart for the mailer.

### The Effect of the RVNG Promotion and the Illegal Proceeds

f.  The RVNG scheme generated millions in illegal proceeds from sales of artificially inflated RVNG shares. Before the promotion, RVNG was thinly traded and its share price did not exceed $.80 per share. Indeed, on many days it was not traded at all. In the time period leading up to and during the promotion, RVNG's daily stock price and trading volume increased dramatically. Following the promotion, RVNG's share price and trading volume dropped equally dramatically.

g.  The following table illustrates the effect that COHEN and his co-conspirators' manipulative conduct had on RVNG:

| Time Period | Average Daily Volume | Daily Closing Price – Low | Daily Closing Price – High | Average Price |
|---|---|---|---|---|
| 3/6/07-5/30/07 | 40,372 | $0.61 | $0.85 | $0.72376 |
| 5/31/07 - 7/31/07 | 2,090,667 | $0.83 | $1.73 | $1.32158 |
| 8/1/07 – 12/31/07 | 148,833 | $0.57 | $1.24 | $0.89907 |

## The KYUS Pump and Dump Scheme

h. Following the successful RVNG pump and dump, COHEN and his co-conspirators participated in another stock market manipulation scheme, this one involving KYUS.

i. In or about October 2007, COHEN and CC#1 wired approximately $300,000 to CC#2's bank accounts to be used to finance part of the KYUS promotion and in furtherance of the scheme.

j. In or about November 2007, KYUS had approximately 36 million common shares issued and outstanding: 24 million restricted shares and 12 million unrestricted shares. Through a series of transfers in or about November 2007, CC#2 acquired and controlled approximately 9 million of these shares, and CC#3 controlled approximately 1.375 million shares.

k. Thereafter, CC#2 and others embarked on a promotional campaign designed to manipulate the price and volume of KYUS stock. As with the RVNG promotion, the KYUS promotion involved manipulative trading and a widely disseminated and materially misleading promotional mailer.

### *Manipulative Trading*

l. For a five-month period beginning on or about November 20, 2007, CC#2, acting in concert with CC#1, COHEN and others, began to actively trade KYUS stock in accounts they controlled. As in the RVNG scheme, COHEN and his co-conspirators intended to create the appearance of liquidity and active market interest in the stock, and to build an attractive price and volume history through their manipulative trading. On many days

8

during this period, CC#2's trading accounted for most of the reported volume in the stock. Many of the trades during this time were, in substance, trades in which CC#2 was on both the "buy" and "sell" sides of the transactions. During this time, CC#2 routed buy and sell orders for the same account through various market makers, including market makers located in New Jersey.[1]

m. In or about May 2008, CC#1 assisted CC#2 in manipulating KYUS stock by, among other things, placing a number of manipulative trades using overseas trading accounts. Specifically, during this time, CC#1 placed and then cancelled a series of successfully higher "buy" orders for KYUS stock at different brokers in order to maximize the false appearance of liquidity, depth and interest in the stock, and to "walk up" the price of KYUS stock.

### The KYUS Promotional Mailer

n. The second aspect of the KYUS pump and dump was a promotional mailer (the "KYUS Mailer"), which was distributed in or around May 2008.

o. The KYUS Mailer was materially false and misleading in numerous ways. For example, it was misleadingly titled "Global Investor Watch" (or "GIW") and claimed to be a Spring 2008 "Special Edition of Premium Members." In reality, Global Investor Watch was a fictional name that COHEN

---

[1] A "market maker" was a broker-dealer firm that held shares of a particular security to facilitate trading in that security. Market-makers electronically displayed buy and sell quotations for a guaranteed number of shares to their customers. For example, when a market-maker received an order, it immediately fulfilled that order from its own inventory, or sought an offsetting order. This entire process was automated and trades were executed within seconds.

and his co-conspirators created specifically for the KYUS promotion. In addition, it contained a KYUS price chart titled "KYUS on the Move" covering the time period from early November 2007 through approximately March 2008. The chart and headline were materially misleading in that most of the KYUS market activity reflected in the chart was the result of CC#2's manipulative trading which was done, at least in part, to create the chart used in the KYUS Mailer.

### *The Effect of the KYUS Promotion and the Illegal Proceeds*

p. As a result of the above activities, COHEN and his co-conspirators manipulated the stock price of KYUS from $0.69 in November 2007 to a high of $3.97 on or about May 23, 2008, with trading volume exceeding 4.4 million shares on that date. Following the dump phase of the scheme, KYUS' stock price and trading volume decreased dramatically. The following table illustrates the effect of COHEN and his co-conspirators' manipulative conduct:

| Time Period | Average Daily Volume | Daily Closing Price – Low | Daily Closing Price – High | Average Price |
|---|---|---|---|---|
| 11/20/07-5/1/08 | 19,609 | $0.60 | $1.69 | $1.25672 |
| 5/2/08 - 5/31/08 | 1,562,697 | $1.65 | $3.97 | $2.51975 |
| 6/1/08 – 7/31/08 | 194,626 | $1.60 | $2.42 | $2.02791 |
| 8/1/08 – 12/31/08 | 26,895 | $0.55 | $1.82 | $0.97212 |

q. Between in or about November 2007 and in or about May 2008, CC#2 sold, or "dumped," approximately 4.4 million of his 9 million KYUS

10

shares for total illegal proceeds of approximately $10.7 million.  In or around late May and early June 2008, CC#2 wired approximately $2.4 million to COHEN and CC#1 – their share of the profits from the successful KYUS pump and dump promotion.

## **OVERT ACTS**

6. In furtherance of the conspiracy and to effect the unlawful objects thereof, the following overt acts, among others, were committed in the District of New Jersey and elsewhere:

   a. On or about June 28, 2007, and on or about July 2, 2007, CC#2 caused approximately 10,000 RVNG shares to be transferred to CC#3 in New Jersey in furtherance of the manipulative trading in RVNG's stock.

   b. On or about November 20, 2007, CC#2 placed a "sell" order for 1,500 KYUS shares at $.60 per share with a market maker. Thereafter, CC#2 placed a "buy" order for 1,500 KYUS shares at $.60 per share through the same market maker. Both orders were routed through the market maker's computer servers in New Jersey.

   c. On or about May 29, 2008, CC#2 caused approximately $500,000 to be wired to COHEN as part of his share of the illegal proceeds in connection with the KYUS pump and dump scheme.

   d. On or about May 27, 2008, CC#2 caused $2.5 million of his illegal proceeds from the KYUS pump and dump scheme to be wired to individuals at KYUS.

All in violation of Title 18, United States Code, Section 371.

_____
PAUL J. FISHMAN
United States Attorney

**CASE NUMBER:**

**United States District Court**
**District of New Jersey**

**UNITED STATES OF AMERICA**

v.

**ITAMAR COHEN**

**INFORMATION FOR**

**18 U.S.C. § 371**

**PAUL J. FISHMAN**
*UNITED STATES ATTORNEY, NEWARK, NEW JERSEY*

NICHOLAS GRIPPO
*ASSISTANT U.S. ATTORNEY*
*NEWARK, NEW JERSEY*
*973-645-2700*